**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

DEAN ALPHONSO CHAMBERS,
                    *Petitioner-Appellant,*

v.

JANET RENO, Attorney General of
the United States; DORIS MEISSNER,
Commissioner, Immigration and
Naturalization Service; RICHARD
CATERISANO, Acting District
Director, Immigration and
Naturalization Service; U.S.
IMMIGRATION & NATURALIZATION
SERVICE; UNITED STATES
DEPARTMENT OF JUSTICE,
                    *Respondents-Appellees.*

DEBORAH ANKER; LENNI B. BENSON;
CAROLYN PATTY BLUM; RICHARD
BOSWELL; ERWIN CHERMERINSKY;
MICHAEL J. CHURGIN; SARAH H.
CLEVELAND; DAVID COLE; MICHAEL
G. HEYMAN; KEVIN R. JOHNSON;
DANIEL KANSTROOM; STEVEN H.
LEGOMSKY; M. ISABEL MEDINA;
GERALD L. NEUMAN; JOHN SCANLAN;
PETER H. SCHUCK; ANDREW
SILVERMAN; IRWIN P. STOTZKY;
MICHAEL J. WISHNIE; LARRY W.
YACKLE,
                    *Amici Curiae.*

No. 00-6364

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Deborah K. Chasanow, District Judge.
(CA-99-3412-DKC)

Argued: June 3, 2002

Decided: October 15, 2002

Before WIDENER and TRAXLER, Circuit Judges, and
Joseph R. GOODWIN, United States District Judge for the
Southern District of West Virginia, sitting by designation.

---

Affirmed by published opinion. Judge Traxler wrote the majority
opinion, in which Judge Widener joined. Judge Goodwin wrote a dis-
senting opinion.

---

## COUNSEL

**ARGUED:** Christopher J. Meade, WILMER, CUTLER & PICKER-
ING, New York, New York, for Appellant. Papu Sandhu, Office of
Immigration Litigation, Civil Division, UNITED STATES DEPART-
MENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:**
Paul A. Engelmayer, Katherine R. Goldstein, WILMER, CUTLER &
PICKERING, New York, New York; Shanta Ramson, RAMSON &
ASSOCIATES, L.L.C., Burtonsville, Maryland; Lee Gelernt, Lucas
Guttentag, Immigrants' Rights Project, AMERICAN CIVIL LIBER-
TIES UNION FOUNDATION, New York, New York, for Appellant.
David W. Ogden, Acting Assistant Attorney General, Emily Anne
Radford, Assistant Director, Office of Immigration Litigation, Civil
Division, UNITED STATES DEPARTMENT OF JUSTICE, Wash-
ington, D.C., for Appellees. Lenni B. Benson, NEW YORK LAW
SCHOOL, New York, New York, for Amici Curiae.

---

## OPINION

TRAXLER, Circuit Judge:

We are asked to decide whether IIRIRA's[1] repeal of discretionary

---

[1] IIRIRA is the Illegal Immigration Reform and Immigrant Responsi-
bility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009-546.

relief for aggravated felons who have been ordered to be deported can be applied to appellant Dean Chambers, who was convicted at trial of an aggravated felony prior to the enactment of IIRIRA. We hold that IIRIRA's repeal of discretionary relief may be applied to Chambers. Accordingly, we affirm the decision of the district court.

I.

Chambers, a native and citizen of Jamaica, entered and began residing in the United States in 1978, when he was two years old. In 1994, at the age of 17, Chambers was convicted of robbery with a deadly weapon after a trial in the Circuit Court for Prince George's County, Maryland. He received a prison sentence of four years, all but 18 months of which was suspended.

Under the Immigration and Nationality Act (INA), an "alien who is convicted of an aggravated felony at any time after admission is deportable." 8 U.S.C. § 1227(a)(2)(A)(iii) (2000). At the time of Chambers' conviction and sentencing, however, his crime did not qualify as an "aggravated felony" within the meaning of the INA and therefore did not render Chambers deportable. Under the pre-IIRIRA version of the INA in effect at the time of Chambers' trial, a "crime of violence" such as robbery with a deadly weapon did not constitute an "aggravated felony" unless it resulted in a prison term of at least five years. 8 U.S.C. § 1101(a)(43)(F) (1994). IIRIRA amended the INA so that a "crime of violence" qualifies as an "aggravated felony" if "the term of imprisonment [is] at least one year." 8 U.S.C. § 1101(a)(43)(F) (2000); *see also INS v. St. Cyr*, 533 U.S. 289, 295-96 n.4 (2001) (explaining that "aggravated felony" is a "term [that] includes any 'crime of violence' resulting in a prison sentence of at least one year (as opposed to five years pre-IIRIRA)").

On April 22, 1997, after IIRIRA took effect, the INS began removal proceedings against Chambers on the grounds that his conviction qualified as an aggravated felony because it was a crime of violence under 8 U.S.C. § 1101(a)(43)(F) for which he had received a sentence of at least one year. Chambers contended that he was not deportable. The immigration judge, however, concluded that Chambers' conviction constituted an aggravated felony and ordered him to be removed from the United States under INA § 237(a)(2)(A)(iii). *See*

8 U.S.C. § 1227(a)(2)(A)(iii). The immigration judge also determined that Chambers could not apply for a discretionary waiver of deportation under INA § 212(c), a form of relief that was repealed by IIRIRA § 304(b).[2] Under pre-IIRIRA law at the time of Chambers' conviction, he would have been eligible to apply for a discretionary waiver of deportation by the Attorney General under former INA § 212(c) because he received a prison sentence of less than five years. *See* 8 U.S.C. § 1182(c) (1994). IIRIRA, however, repealed INA § 212(c). *See* IIRIRA § 304(b), 110 Stat. 3009-597.[3] Thus, discretionary relief under INA § 212(c) was available at the time of Chambers' trial, conviction, and sentencing, but not at the time that his removal procedures began. The immigration judge applied the repeal of INA § 212(c) to Chambers' case and concluded that his application for relief under that section was "pretermitted." J.A. 22. The Board of Immigration Appeals affirmed the decision of the immigration judge that Chambers was removable and not eligible for any form of relief from removal.

Chambers then sought to challenge the Board's ruling by filing an application for habeas relief under 28 U.S.C.A. § 2241 (West 1994). Chambers contended that the BIA's application of IIRIRA's repeal of INA § 212(c) produced an impermissible retroactive effect. Thus, Chambers contended that he was still eligible for discretionary relief under the version of INA § 212(c) that was in effect at the time of his conviction. Quoting *Tasios v. Reno*, 204 F.3d 544, 552 (4th Cir. 2000), the district court rejected Chambers' argument and held that the application of the repeal of INA § 212(c) would not "upset 'reasonable, settled expectations and change the legal effect of prior conduct.'" J.A. 48.

---

[2]The immigration judge also concluded that Chambers was not eligible for "cancellation of removal," a new form of relief under IIRIRA. 8 U.S.C. § 1229b(a) (2000). This particular form of relief is not an issue in this appeal.

[3]Under the current version of the INA, the Attorney General has the authority to cancel removal for certain inadmissible or deportable aliens, but not for aliens "convicted of any aggravated felony." 8 U.S.C. 1229b(a)(3); *see also INS v. St. Cyr*, 533 U.S. 289, 297 (2001).

Chambers then brought this appeal, which we held in abeyance for the Supreme Court's decision in *St. Cyr*. The Supreme Court has issued its decision in *St. Cyr* and provided guidance on the retroactive application of IIRIRA § 304(b). Having received supplemental briefs from the parties on the impact of *St. Cyr* on this appeal, we now address Chambers' contention that IIRIRA § 304(b) cannot be applied in his case.[4] In *St. Cyr*, the Supreme Court held that discretionary relief under INA § 212(c) "remains available for aliens . . . whose convictions were obtained through plea agreements and who . . . would have been eligible for § 212(c) relief at the time of their plea under the law then in effect." 533 U.S. at 326. We are presented with the very narrow question of whether the fact that Chambers was convicted at trial rather than by guilty plea pursuant to a plea agreement changes the result dictated by *St. Cyr*. We conclude that, in Chambers' case, it does.

## II.

In *St. Cyr*, the Supreme Court affirmed its two-part analytical process for considering potentially retroactive statutes. First, a court must decide "whether Congress has directed with the requisite clarity that the law be applied retrospectively." *Id.* at 316; *see also Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994) ("When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach."). We may not apply a statute retroactively "absent a clear indication from Congress that it intended such a result." *St. Cyr*, 533 U.S. at 316. "Requiring clear intent assures that Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay

---

[4]*St. Cyr* also definitively answered (in the negative) the question of whether Congress repealed habeas jurisdiction under § 2241 in cases such as this one. *See* 533 U.S. at 314. In view of that portion of the *St. Cyr* decision, the government abandoned its challenge to the district court's assumption of habeas jurisdiction under § 2241. We note, however, that the district court correctly rejected the government's jurisdictional challenge based on contrary circuit precedent. *See Tasios v. Reno*, 204 F.3d 544, 547 (4th Cir. 2000); *Bowrin v. INS*, 194 F.3d 483, 486-89 (4th Cir. 1999) (per curiam).

for the countervailing benefits." *Landgraf*, 511 U.S. at 272-73. If Congress has expressly commanded that the statute must, or must not, be applied retrospectively, "our inquiry is concluded." *Tasios*, 204 F.3d at 548. However, when Congress has not spoken with the requisite clarity, the next step in the retroactivity analysis is to determine whether the application of the statute "produces an impermissible retroactive effect." *St. Cyr*, 533 U.S. at 320. "If so, then in keeping with our traditional presumption against retroactivity, we presume that the statute does not apply to [the conduct at issue]." *Martin v. Hadix*, 527 U.S. 343, 352 (1999) (internal quotation marks omitted).

## A.

*St. Cyr* established that Congress did not provide a sufficiently clear command with respect to the temporal reach of the repeal of INA § 212(c) by IIRIRA § 304(b). *See St. Cyr*, 533 U.S. at 320 (rejecting "the conclusion that, in enacting § 304(b), Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits" (internal quotation marks omitted)). Lacking such express instructions from Congress, we move directly to the question of whether applying the repeal of INA § 212(c) to Chambers produces an impermissible retroactive effect.

## B.

A new statute does not produce a retroactive effect "merely because it is applied in a case arising from conduct antedating the statute's enactment." *Landgraf*, 511 U.S. at 269. The question instead is "whether the new provision attaches new legal consequences to events completed before its enactment." *Id.* at 270. A statute would attach new legal consequences to prior events if its application "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.* at 280. The question of whether a new statute attaches new legal consequences to prior conduct "demands a commonsense, functional judgment" that "should be informed and guided by familiar considerations of fair notice, reasonable reliance, and settled expectations." *Martin*, 527 U.S. at 357-58 (internal quotation marks omitted).

In *St. Cyr*, the Court considered whether IIRIRA's repeal of discretionary relief under INA § 212(c) would have a retroactive effect if applied to an alien who was "convicted pursuant to a plea agreement at a time when [his] plea would not have rendered [him] ineligible for § 212(c) relief." *St. Cyr*, 533 U.S. at 320. The Court concluded that applying the repeal to aliens "who entered into plea agreements *with the expectation* that they would be eligible for [§ 212(c)] relief" would "attach[ ] new legal consequences to events completed before its enactment" and produce a retroactive effect. *Id.* at 321 (emphasis added) (internal quotation marks omitted).

In reaching this conclusion, the Court focused on an alien's reasonable reliance on the possibility of discretionary relief under INA § 212(c) as one of the most important factors prompting him to forego trial and enter a plea agreement. "Given the frequency with which § 212(c) relief was granted in the years leading up to . . . IIRIRA," the Court reasoned that "preserving the possibility of such relief would have been one of the principal benefits sought by defendants deciding whether to accept a plea offer or instead to proceed to trial." *Id.* at 323. Indeed, "[t]here can be little doubt that, as a general matter, alien defendants considering whether to enter into a plea agreement are acutely aware of the immigration consequences of their convictions." *Id.* at 322. The Court held that "[b]ecause [St. Cyr], and other aliens like him, almost certainly relied upon [the] likelihood [of receiving discretionary relief] in deciding whether to forgo their right to a trial, the elimination of any possibility of § 212(c) relief by IIRIRA has an obvious and severe retroactive effect." *Id.* at 325.

1.

Chambers suggests that under the reasoning of *St. Cyr*, he possesses similar reliance interests that would cause the application of IIRIRA § 304(b) in his case to operate retroactively. An alien in Chambers' position, however, does not have a reliance interest comparable to that which was at the heart of *St. Cyr*. The alien in *St. Cyr* made his decisions in the context of the *quid pro quo* relationship established by a plea agreement where, "[i]n exchange for some perceived benefit, defendants waive several of their constitutional rights (including the right to a trial) and grant the government numerous tangible benefits, such as promptly imposed punishment without the

expenditure of prosecutorial resources." *Id.* at 322 (internal quotation marks omitted). The "perceived benefit" of the plea agreement was the very real possibility of § 212(c) relief: "Relying upon settled practice, the advice of counsel, and perhaps even assurances in open court that the entry of the plea would not foreclose § 212(c) relief, a great number of defendants in . . . St. Cyr's position agreed to plead guilty." *Id.* at 323. The Court concluded that the application of IIRIRA § 304(b) to St. Cyr "would surely be contrary to familiar considerations of fair notice, reasonable reliance, and settled expectations" because the new statute would deprive St. Cyr of the benefit he sought in exchange for pleading guilty while the government still enjoyed "the benefit of the[ ] plea agreement[ ], [an] agreement[ ] that [was] likely facilitated by the alien['s] belief in [his] continued eligibility for § 212(c) relief." *Id.* (internal quotation marks omitted).

Thus, in order to obtain the benefit of continued eligibility for relief under INA § 212(c), St. Cyr entered a guilty plea pursuant to the terms of a plea agreement — a decision that resulted in *an immediate and detrimental change of position with respect to his immigration status*. The key event in terms of *St. Cyr*'s analysis of whether the new statute would produce a retroactive effect was the alien's decision to abandon his constitutional right to a trial and plead guilty to a deportable offense in reliance on prior law. *See St. Cyr*, 533 U.S. at 325. In reliance on the continued availability of INA § 212(c), St. Cyr pled guilty — a decision that immediately changed his status from non-deportable to deportable. *See Velasquez-Gabriel v. Crocetti*, 263 F.3d 102, 109 (4th Cir. 2001) ("In contrast to the aliens in *St. Cyr* and *Tasios*, Velasquez-Gabriel posits no way in which his marriage in "reliance" on preexisting law weakened his *immigration status* under the new law or hurt his chances of remaining in this country.").

In light of our reading of *St. Cyr*, Chambers' argument that an immigrant may go to trial in reliance on the availability of § 212(c) relief is flawed for at least two reasons. First, it is not likely that aliens who go to trial to challenge the underlying crime do so primarily because they hope to obtain discretionary relief. The reliance interest in pleading guilty arises because of the *quid pro quo* exchange that characterizes a plea agreement but not trial. *St. Cyr* recognized that the reason an alien would agree to plead guilty and thereby acquire "deportable" status is the expectation that, by conferring a benefit on

the government, he would receive a benefit in return — a reduced sentence that would *ensure continued eligibility* for discretionary relief. *See id.* at 323-24. By contrast, an alien who goes to trial does not act to preserve eligibility under INA § 212(c). In fact, by rolling the dice and going to trial, Chambers actually ensured that his eligibility for discretionary relief would remain uncertain. Charged with an offense carrying a maximum prison sentence of 20 years, Chambers was offered a plea agreement whereby he would receive a sentence of four years,[5] which at the time would have kept him eligible for discretionary relief. *See* 8 U.S.C. § 1182(c) (1994). By going to trial, Chambers rejected the certainty of eligibility by risking a sentence of more than five years in the event he was unable to successfully defend against the underlying charge. The fact that Chambers ended up with a shorter prison term than that offered by the government — one that was safely below the five-year eligibility threshold for § 212(c) relief at the time of sentencing — does not change the fact that Chambers proceeded to trial fully aware of the risk that he would be convicted and sentenced to a prison term that would disqualify him under INA § 212(c).

Second, in contrast to aliens who plead guilty, Chambers made no decision that adversely impacted his immigration status. *See Velasquez-Gabriel*, 263 F.3d at 109. An alien cannot (and could not at the time of Chambers' trial) be deported for an aggravated felony without first being convicted of a crime that qualifies as a deportable offense. Thus, an alien who enters a guilty plea to a qualifying crime acquires "deportable alien" status, thereby weakening his immigration status and taking a substantial step towards actual deportation. The decision to go to trial, however, does not render an alien deportable or subject him to certain deportation. Really, the opposite is true — aliens who go to trial act to preserve, not weaken, their immigration status by challenging the underlying crime.

We also reject Chambers' suggestion that he detrimentally relied on prior law because his offense was not even deportable at the time of his conviction and therefore he "wrongly believ[ed] there [was] no immigration benefit to negotiating to a plea." Supp. Brief of Appel-

---

[5]These facts are drawn from the representations of the parties at oral argument.

lant at 6. IIRIRA § 321(a)(3) expanded the definition of "aggravated felony" to include "crimes of violence" resulting in a prison term of at least one year. *See* 8 U.S.C. § 1101(a)(43)(F) (2000). At the time of Chambers' trial, a "crime of violence" did not qualify as an "aggravated felony" — for which an alien could be deported — unless the resulting term of imprisonment was at least five years. Chambers contends the state of the law with respect to potential immigration consequences gave him no incentive to negotiate a plea agreement; hence, he unwittingly "focus[ed] on the criminal justice aspects of whether to go to trial or negotiate a plea." Supp. Brief of Appellants at 7. Again, Chambers makes an argument that is misguided on at least two counts. First, Chambers' decision not to plead guilty did have immigration implications even then. Although Chambers' conviction did not render him deportable at the time of his sentencing, Chambers was, *at the time he made the decision to go to trial*, charged with a violent offense carrying a maximum sentence that far exceeded the five-year threshold necessary for an offense to qualify as an "aggravated felony." That is, at the time of trial, Chambers was facing a charge that could potentially render him deportable. Chambers went to trial in the face of this risk, gambling that, if convicted, he would not receive such a high sentence that he would be rendered deportable. That Chambers ultimately received a sentence that did not render him deportable at the time is inconsequential, as far as goes the calculus Chambers used in determining whether to risk trial or not. Accordingly, it is simply not true that Chambers had no immigration incentive to negotiate a plea on the underlying charge. Second, this argument is essentially an indirect attack upon the retroactive application of the new, more expansive definition of "aggravated felony" as amended by IIRIRA § 321(a)(3). Chambers, of course, does not directly contend that IIRIRA § 321 cannot be retroactively applied to him because Congress has unambiguously instructed that the amended definition of "aggravated felony" applies to qualifying convictions entered before, on or after IIRIRA's enactment. *See* IIRIRA § 321(b), 110 Stat. 3009-628; *St. Cyr*, 533 U.S. at 318-19. In short, the fact that Chambers' conviction was not a deportable offense at the time of his sentencing, but later became so after IIRIRA was enacted, does not cause IIRIRA's repeal of discretionary relief to operate retroactively with respect to Chambers.[6]

---

[6]We note that the result reached by our decision is in accord with that reached by other circuit courts of appeal considering virtually the same issue. *See Armendariz-Montoya v. Sonchik*, 291 F.3d 1116, 1121 (9th Cir. 2002); *Lara-Ruiz v. INS*, 241 F.3d 934, 945 (7th Cir. 2001).

2.

Chambers contends that detrimental reliance is not a *sine qua non* for retroactive operation of a new statute. Despite the central role played by the element of reliance in *St. Cyr*, Chambers urges us to apply an analytical formula that does not include reliance as a consideration. Specifically, Chambers relies on *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939 (1997), as support for the proposition that he need not demonstrate reliance upon prior law for the new statute to operate retroactively.

As a general matter, we agree that the Supreme Court has not limited its examination of a statute's retroactive effect to one single, rigid test. In recent years, the Court has reiterated its adherence to Justice Story's "influential definition" of a retroactive statute as one "which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past." *Landgraf*, 511 U.S. at 268-69 (internal quotation marks omitted); *see St. Cyr*, 533 U.S. at 321; *Hughes Aircraft*, 520 U.S. at 947. However, these decisions have also reminded us that Justice Story's definition "'does not purport to define the outer limit of impermissible retroactivity'" and merely "describes several '*sufficient*,' as opposed to '*necessary*,' conditions for finding retroactivity." *St. Cyr*, 533 U.S. at 321 n.46 (quoting *Hughes Aircraft*, 520 U.S. at 947). Rather, "the Court has used various formulations to describe the functional conception of legislative retroactivity." *Hughes Aircraft*, 520 U.S. at 947 (internal alteration and quotation marks omitted); *see Landgraf*, 511 U.S. at 269. Of course, as the Supreme Court has "repeatedly counseled, the judgment whether a particular statute acts retroactively should be informed and guided by familiar considerations of fair notice, reasonable reliance, and settled expectations." *St. Cyr*, 533 U.S. at 321 (internal quotation marks omitted).

In view of these observations by the Court about retroactivity, we have acknowledged that an alien's failure to demonstrate reliance on pre-IIRIRA law might not foreclose a claim that the post-IIRIRA version of the INA operates retroactively. *See Velasquez-Gabriel*, 263 F.3d at 109 (citing *Hughes Aircraft* for the proposition that the application of newly enacted INA § 241(a)(5) might operate retroactively

even though the alien was unable to demonstrate any reliance upon the prior version of the INA). Even if that is so, *Hughes Aircraft*, upon which Chambers relies, does not aid him. In *Hughes Aircraft*, the Court applied Justice Story's definition and, without discussing reliance, held that an amendment to the False Claims Act operated retroactively because it eliminated a defense to a *qui tam* action based on pre-amendment conduct. *See* 520 U.S. at 951-52. IIRIRA's repeal of the discretionary relief provision, however, unlike the amendment at issue in *Hughes Aircraft*, does not "take[ ] away or impair[ ] vested rights acquired under existing laws, or create[ ] a new obligation, impose[ ] a new duty, or attach[ ] a new disability," *id.* at 947 (internal quotation marks omitted), with respect to the *relevant past conduct*, *i.e.*, Chambers' decision to go to trial. Nor, as Chambers suggests, does the repeal "attach[ ] new legal consequences to events completed before [IIRIRA's] enactment," *Martin*, 527 U.S. at 357-58 (internal quotation marks omitted), or give "a quality or effect to acts or conduct which they did not have or did not contemplate when they were performed," *Union Pac. R.R. Co. v. Laramie Stock Yards Co.*, 231 U.S. 190, 199 (1913), because IIRIRA did not change the impact of Chambers' decision to go to trial on his immigration status. As we have already noted, Chambers' *decision to go to trial* did not render him deportable or subject him to certain deportation, regardless of whether pre- or post-IIRIRA law is applied.

## III.

The application of IIRIRA § 304(b), which repealed discretionary relief from deportation formerly available under INA § 212(c), is not impermissibly retroactive as to Chambers. Accordingly, we affirm the decision of the district court.

*AFFIRMED*

GOODWIN, District Judge, dissenting:

The majority concludes that IIRIRA's repeal of discretionary relief under § 212(c) does not attach a new disability to Chambers's past conduct. This is because the majority considers Chambers's decision to go to trial to be the "*relevant past conduct*," *ante* at 12, for the purpose of determining a retroactive effect. I part company with the

majority simply because I find the relevant conduct to be Chambers's crime of conviction rather than his decision to go to trial. My logic is simple. Whether before or after amendment, the only statutory consequences were those flowing from Chambers's criminal conduct. Without IIRIRA § 304(b)'s repeal of § 212(c) waivers, an alien who committed armed robbery faced imprisonment and possible deportation. With IIRIRA § 304(b), an alien committing armed robbery faces imprisonment and certain deportation.[1] To my mind, this change impermissibly "attaches new legal consequences to events completed before" the enactment of IIRIRA, and therefore has a retroactive effect. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 270 (1994). Accordingly, I respectfully dissent. I will first explain why I believe that we must focus on Chambers's underlying criminal conduct when determining whether this change in the law has a retroactive effect. With that focus in mind, I will then explain why this change in the law has a retroactive effect as applied to Chambers.

## I.

The majority, in determining whether the repeal of § 212(c) has an impermissible retroactive effect, considers Chambers's conduct at trial but not his underlying primary conduct, that is, the criminal conduct which lead to his conviction. While the Supreme Court in *St. Cyr* did consider the alien's secondary conduct — his decision to plead guilty — the Court did not suggest that the alien's guilty plea was the *only* relevant past conduct for the purposes of determining retroactive

---

[1] I say "without IIRIRA § 304(b)" and "with IIRIRA § 304(b)" rather than "prior to IIRIRA" and "after IIRIRA" because, as the majority explains, prior to IIRIRA Chambers's armed robbery conviction and sentence did not render him deportable at all. IIRIRA changed the law in two relevant respects to the detriment of aliens like Chambers. First, it expanded the definition of "aggravated felony" so that Chambers's armed robbery conviction now constitutes an aggravated felony and renders him eligible for deportation. Second, it eliminated § 212(c) waivers for aliens convicted of aggravated felonies. This first change clearly applies to Chambers, because, as the majority explains, Congress explicitly said so. *See ante* at 10. Thus, when considering whether § 304(b)'s elimination of § 212(c) waivers has a retroactive effect by changing the legal landscape prior to IIRIRA, one must treat the expansion of the "aggravated felony" definition as part of that pre-IIRIRA legal landscape.

effect.[2] A defendant's underlying, primary conduct has always served as the starting point for a retroactivity analysis. For example, in *Domond v. INS*, 244 F.3d 81 (2d Cir. 2001), which involved the very issue presented in this case, the Second Circuit focused on whether the elimination of § 212(c) altered "the punishment for the [alien's] *underlying criminal conduct*." *Id.* at 86 (emphasis added).[3] *See also Tasios v. Reno*, 204 F.3d 544, 551 (4th Cir. 2000) ("In considering whether § 212(c) would alter the legal effect of conduct that predates AEDPA's enactment, we do not *limit* our analysis to the conduct that resulted in the felony conviction.") (emphasis added).

When determining whether to apply a new rule of law to a pending case, courts often draw a distinction between procedural and substantive rules, a distinction that turns on what type of conduct is regulated by the new rule. "The relevant rule is that statutes which change primary (out of court) duties, for example statutes that impose new tort liabilities, are applied prospectively, while statutes that change merely procedures are applied retroactively." *LaGuerre v. Reno*, 164 F.3d 1035, 1041 (7th Cir. 1998). The logic behind this approach is that "[b]ecause rules of procedure regulate secondary rather than primary conduct, the fact that a new procedural rule was instituted after the

---

[2]I use the term "primary conduct" to refer to the conduct that is the subject of the regulation in question and the term "secondary conduct" to refer to subsequent conduct that is not the direct subject of the regulation, such as decisions in the course of judicial proceedings.

[3]The *Domand* court went on to conclude that "loss of the Section 212(c) hearings, while clearly a hardship, does not impose a new legal consequence on Domond's pre-AEDPA criminal conduct." *Id.* at 86. Because "waivers from Section 212(c) hearings were [always] purely discretionary," the court reasoned that their loss did not constitute a new legal consequence. Soon after *Domand* was decided, the Supreme Court stated that "the fact that § 212 relief is discretionary does not affect the . . . conclusion [that § 304(b) has a retroactive effect]. There is a clear difference, for the purposes of retroactivity analysis, between facing possible deportation and facing certain deportation." *INS v. St. Cyr*, 533 U.S. 289, 325 (2001). Thus the court in *Domond* properly asked whether the revocation of § 212(c) waivers imposed a new legal consequence on the *underlying criminal conduct*, as opposed to simply the alien's conduct at trial, but then mistakenly concluded that the cancellation of a discretionary form of relief imposed no new legal consequences on that conduct.

conduct giving rise to the suit does not make the application of the rule at trial retroactive." *Landgraf*, 511 U.S. at 275. The § 212(c) waiver, and the corresponding elimination of that waiver by IIRIRA § 304(b), are clearly both substantive laws that regulate primary conduct, not merely procedural rules that regulate subsequent conduct such as litigation decisions. The conduct being regulated by § 212(c) (and its elimination by § 304(b)) is, first and foremost, the underlying criminal conduct leading to a conviction that rendered the alien subject to deportation and therefore in need of a § 212(c) waiver. Accordingly, it is counterintuitive to only consider the effect of this substantive legal change on Chambers's prior secondary conduct, as opposed to its effect on his prior criminal conduct.

In this case, the majority focuses on Chambers' secondary conduct to the *exclusion* of considering his primary conduct, the crime itself. While the "relevant past conduct" for even a substantive legal change (such as the elimination of § 212(c) waivers) may sometimes include secondary conduct, the main focus should be on the underlying criminal conduct. With this focus on Chambers's underlying criminal conduct in mind, I will now turn to consider whether IIRIRA's elimination of § 212(c) relief from deportation has an impermissible retroactive effect.

## II.

As the Supreme Court explained in *St. Cyr*, "[t]here is a clear difference, for the purposes of retroactivity analysis, between facing possible deportation and facing certain deportation." *INS v. St. Cyr*, 533 U.S. 289, 325 (2001). Prior to IIRIRA, an alien committing an aggravated felony was faced with imprisonment and possible deportation. After IIRIRA's elimination of § 212(c) waivers, an alien committing those same aggravated felonies faces imprisonment and certain deportation.[4] This change "attaches new legal consequences to events com-

---

[4]As noted above, *supra* n.1, Chambers's armed robbery conviction did not constitute an "aggravated felony" prior to IIRIRA. But because Congress explicitly instructed that IIRIRA's expanded definition of "aggravated felony" would apply to crimes committed prior to IIRIRA's enactment, we must (for the limited purpose of determining the retroactive effect of § 340(b)) treat Chambers's armed robbery as an "aggravated felony" from the moment it was committed.

pleted before" the enactment of IIRIRA, and therefore has a retroactive effect. *Landgraf*, 511 U.S. at 270. Accordingly, IIRIRA's repeal of § 212(c) should not be applied retroactively to Chambers.

I agree with the majority's rejection of Chambers's argument that he relied on the availability of § 212(c) when he decided to go to trial. This is not a case, like *St. Cyr*, where the unfairness of retroactively applying the rule stems from reliance concerns. As the majority acknowledges, however, reliance is merely one way to prove an unfair retroactive effect; it is by no means the only test of unfair retroactivity. *See Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 947 (1997); *Velasquez-Gabriel v. Crocetti*, 263 F.3d 102, 109 (4th Cir. 2001). Detrimental reliance is simply one manifestation of the unfairness that can result from instability in the law. But the presumption against retroactivity is grounded in broader and more fundamental concerns. As Justice Scalia has explained, there is "timeless and universal human appeal" to the notion that "the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place." *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 855 (1990) (Scalia, J., concurring). Apart from reliance, the presumption against retroactivity reflects the more basic concern that people "should have an opportunity to know what the law is and to conform their conduct accordingly." *Landgraf*, 511 U.S. at 265. This concern "relates to concepts of governmental legitimacy." Nancy Morawetz, *Rethinking Retroactive Deportation Laws and the Due Process Clause*, 73 N.Y.U. L. Rev. 97, 136 (1998). "[T]he government engenders greater respect for its laws and its lawmaking institutions if it can commit to the stability of its laws." Jill E. Fisch, *Retroactivity and Legal Change: an Equilibrium Approach*, 110 Harv. L. Rev. 1055. 1106 (1997). That is, the government operates with greater fairness, and thus greater legitimacy, when it does not change the rules midway through the game. Thus the presumption against retroactivity, like the various constitutional protections against retroactive legislation, serves to "limit[ ] the sovereign's ability to use its lawmaking power to modify bargains it has made with its subjects." *Lynce v. Mathis*, 519 U.S. 433, 440 (1997).[5] Regardless of

---

[5]The presumption against retroactivity does not place absolute limits on Congress's power to enact retroactive legislation, as does, for exam-

whether a particular individual actually relies to his detriment on the legal regime, the government must at least give individuals the *opportunity* to know the law and behave accordingly.

It is instructive to compare Chambers's situation to that of the defendant in *Hughes*. In *Hughes*, the question before the Court was whether the elimination of a defense to statutory *qui tam* actions had a retroactive effect, such that the change should only apply prospectively. *Hughes*, 520 U.S. at 941. Between 1982 and 1986, the False Claims Act required dismissal of *qui tam* actions that were based on evidence or information that was already in the possession of the government when the action was brought. *Id.* at 945. In 1986 Congress changed the FCA to remove this limitation except in certain circumstances. *Id.* at 946. The *qui tam* plaintiff argued that this amendment had no retroactive effect because it did not create a new cause of action or impose liability where none had existed previously. *Id.* at 948. Even under the pre-1986 version of the FCA, the plaintiff argued, an FCA defendant faced monetary liability for false claims against the government because the United States could pursue the claim against the defendant regardless of whether a *qui tam* plaintiff could bring the claim. *Id.* at 948-49. The 1986 version of the FCA simply meant that, in cases where the evidence of a false claim was in the possession of the government, a false claims lawsuit could be brought by a *qui tam* plaintiff as well as by the United States. A unanimous Supreme Court rejected this argument, noting that while "monetary liability faced by an FCA defendant is the same whether the action is brought by the Government or by a *qui tam* relator, the 1986 amendment eliminates a defense to a *qui tam* suit . . . and therefore changes the substance of the existing cause of action for *qui tam* defendants by 'attach[ing] a new disability, in respect to transactions or considerations already past.'" *Id.* at 948.

---

ple, the Ex Post Facto clause or the Due Process Clause. *See Lynce*, 519 U.S. at 439-40. Nonetheless, it forces Congress to bear the political weight of the perceived unfairness of retroactive legislation by requiring Congress to explicitly and clearly state that the legislation will be applied retroactively. Thus, while the presumption is not an absolute barrier, it does place a constraint on retroactive legislation by permitting retroactivity only when Congress is willing to say so explicitly.

There was no suggestion in *Hughes* that the 1986 amendment to the *qui tam* statute raised reliance concerns — that is, that the defendant had submitted a false claim to the government in reliance on the fact that only the government, not a *qui tam* plaintiff, could bring an action based on that false claim. Such a claim of reliance would have been as implausible as a claim of reliance in this case — that when Chambers committed robbery with a deadly weapon, he relied on the fact that he would only be subject to imprisonment and *possible* deportation rather than imprisonment and *certain* deportation. *Hughes* reflects the view that, apart from whether an individual actually relies on the preexisting legal regime, courts should not presume that Congress meant to change the rules midway through the game. *Hughes* illustrates how "[e]ven when the conduct in question is morally reprehensible or illegal, a degree of unfairness is inherent whenever the law imposes additional burdens based on conduct that occurred in the past." *Landgraf*, 511 U.S. at 282 n.35. Chambers's armed robbery was illegal at the time it was committed, and he has been imprisoned accordingly. The repeal of the § 212(c) waiver, however, "imposes additional burdens on conduct that occurred in the past." *Id.* Accordingly, we should not, as a matter of judicial presumption, apply this change retroactively unless explicitly instructed to do so by Congress.

Chambers's situation can also be contrasted with that of the alien in *Velasquez-Gabriel v. Crocetti*, 263 F.3d 102 (4th Cir. 2001). Velasquez-Gabriel was an alien who had illegally reentered the United States while under a prior order of removal. *Id.* at 103-04. After his illegal reentry, the law changed so as to require reinstatement of his prior order of removal without the opportunity to reopen or obtain review of that prior order. *Id.* at 104. The court held that this change in the law did not operate in an impermissibly retroactive manner. The court first explained that Velasquez-Gabriel had not taken any actions in reliance on the old law; thus, the law was not retroactive for that reason. *Id.* at 109. The court then noted that even absent proof of reliance, the change in the law might still have a retroactive effect. Another concern underlying retroactivity, the court noted, is that persons subject to the law have an "opportunity to know what the law [was] and to conform [his] conduct accordingly." *Id.* at 109-10 (quotations and citations omitted). Velasquez-Gabriel, the court explained, had seven months to apply for adjustment of status before the new law was enacted and another six months after that to

apply for adjustment of status before the new law went into effect. *Id.* at 109. Thus, Velasquez-Gabriel had had over a year during which he could have taken affirmative action to request adjustment of status under the old legal regime before the law changed and deprived him of that opportunity. The court explained that "Velasquez-Gabriel's failure to apply to adjust his resident status before the new law took effect fatally undermines his contention that § 241(a)(5)'s application to him 'attaches new legal consequences to events completed before its enactment.'" *Id.* at 110 (*quoting St. Cyr*, 533 U.S. at 321) (emphasis omitted). Here, in contrast, Chambers' fate was out of his hands once he had committed the armed robbery. After that act, Chambers faced imprisonment and, once Congress mandated that his crime was an aggravated felony, the possibility of deportation unless he was granted a § 212(c) waiver. He had no further opportunity, as Velasquez-Gabriel did, to "know what the law was and to conform his conduct accordingly." *Id.* at 109-10 (quotations and alterations omitted). From the time of the robbery on, he was at the mercy of the government both in his criminal prosecution and in his subsequent deportation proceedings.

I agree with the majority's characterization of the law except insofar as it fails to consider any retroactive effect to Chambers's underlying criminal conduct. Applying the majority's analysis on pages 11-12 of its opinion to that underlying primary conduct, I would conclude that IIRIRA's repeal of the discretionary relief provision does "attach[ ] a new disability," *Hughes*, 520 U.S. at 947, with respect to the relevant past conduct, *i.e.*, Chambers's commission of the armed robbery. The repeal "attaches new legal consequences to events completed before [IIRIRA's] enactment," *Martin v. Hadix*, 527 U.S. 343, 357-58 (1999) (internal quotation marks omitted), and gives "a quality or effect to acts or conduct which they did not have or did not contemplate when they were performed," *Union Pac. R.R. Co. v. Laramie Stock Yards Co.*, 231 U.S. 190, 199 (1913), because IIRIRA changed the impact of Chambers's commission of armed robbery on his immigration status. Because "the legal effect of [Chambers's criminal] conduct is determined by subsequently enacted law, that law operates retroactively." *Tasios*, 204 F.3d at 551. Absent a clear Congressional indication that this change in the law should retroactively deprive Chambers of the possibility of relief from otherwise certain deportation, the traditional presumption against retroactivity should bar the

retroactive loss of the § 212(c) waiver in this case. Accordingly, I would reverse the decision of the district court.