

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-28-2004

# Ponnapula v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 03-1255

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Ponnapula v. Atty Gen USA" (2004). *2004 Decisions.* Paper 533.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/533

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

IN THE UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT
_____

NO.  03-1255
_____

MURALI KRISHNA PONNAPULA;

v.

JOHN ASHCROFT, Attorney General of
the
United States of America; JAMES W.
ZIGLAS, Commissioner of the
Immigration and Naturalization Service;
EDWARD MCELROY, New York City
District Director of the Immigration and
Naturalization Service;
KENNETH ELWOOD, Philadelphia
District Director of the
Immigration and Naturalization Service;
IMMIGRATION &
NATURALIZATION SERVICE;
UNITED STATES DEPARTMENT OF
JUSTICE,

*Appellants*

_____

On Appeal from the United States
District Court For
The Middle District of Pennsylvania
(D.C. No. 02-cv-01214)

District Judge: Honorable Sylvia H.
Rambo
_____

Argued February 26, 2004

Before: RENDELL, BARRY and
BECKER, *Circuit Judges*

(Filed   June 28, 2004 )

DARYL F. BLOOM
Office of United States Attorney
Federal Building
228 Walnut Street
P.O. Box 11754
Harrisburg, PA 17108

WILLIAM C. MINICK (Argued)
United Sates Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

*Attorneys for Appellants*

ALEXANDER E. EISEMANN (Argued)
282 Katonah Ave.
Suite 244
Katonah, NY 10536

*Attorney for Appellee*

PAUL A. ENGELMAYER
CHRISTOPHER J. MEADE (Argued)
KATHERINE R. GOLDSTEIN
Wilmer, Cutler & Pickering
399 Park Avenue
New York, NY 10022

JOSHUA L. DRATEL
National Association of Criminal
Defense Lawyers
Joshua L. Dratel, P.C.
14 Wall Street
New York, NY 10005

JONATHAN E. GRADESS, Executive
Director
MANUEL D. VARGAS, Project
Director
Immigrant Defense Project
New York State Defenders Association
P.O. Box 20058
West Village Station
New York, NY 10014

*Attorneys for Amici Curiae, National
Association of Criminal Defense Lawyers
and the New York State Defenders
Association in Support of Appellee*

————————————————

OPINION OF THE COURT

————————————————

BECKER, *Circuit Judge*.

This appeal centers on the question whether the Immigration and Naturalization Service ("INS") can apply a new law retroactively in a way that will alter the immigration consequences of an immigrant's decision made under prior law.[1] Under former § 212(c) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(c) (repealed 1996), deportable aliens who had accrued seven years of lawful permanent residence in the United States could request discretionary relief from deportation by arguing that the equities weighed in favor of their remaining in the United States. Even an alien deportable because he had been convicted of an aggravated felony, *see* 8 U.S.C. § 1227(a)(2)(A)(iii) (1994), was eligible for such discretionary relief if he served a term of imprisonment less than five years. *See* 8 U.S.C. § 1182(c).

Section 212(c) was repealed in September 1996, when Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009-546 (codified in scattered sections of 8 U.S.C.). Section 304(b) of IIRIRA repealed § 212(c) relief entirely, replacing it with a procedure called "cancellation of removal," *see* 8 U.S.C. § 1229b (1996), and providing that cancellation of removal is not available to an alien convicted of any aggravated felony. This provision was consistent with section 440(d) of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (codified in relevant part at 8 U.S.C. § 1182 (1996)), enacted shortly

_____

[1]Since March 1, 2003, the INS has been part of the Department of Homeland Security. The activity involved in this case is now carried on by the Bureau of Immigration and Customs Enforcement. However, since the case began as an INS matter, we shall continue to refer to the INS.

2

before IIRIRA, which rendered aliens convicted of aggravated felonies, regardless of the length of their sentence, ineligible for discretionary relief from deportation under former § 212(c).

In *INS v. St. Cyr*, 533 U.S. 289, 326 (2001), the Supreme Court held that discretionary relief under former § 212(c) "remains available for aliens . . . whose convictions were obtained through plea agreements and who . . . would have been eligible for § 212(c) relief at the time of their plea under the law then in effect." In *St. Cyr*, the Court needed to determine whether IIRIRA section 304(b) applied retroactively. After concluding that Congress did not provide a sufficiently clear command with respect to the temporal reach of the repeal of former § 212(c) by IIRIRA section 304(b), the Court applied the next step of the familiar principles of *Landgraf v. USI Film Products*, 511 U.S. 244 (1994), to determine whether the repeal had an impermissible retroactive effect. *Landgraf* cataloged a history of Supreme Court precedent establishing a "presumption against statutory retroactivity," *id.* at 270, in the absence of a clear command from Congress. A statute will be impermissibly retroactive when it attaches new legal consequences to prior events because its application "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.* at 280. The question whether a new statute attaches new legal consequences to prior conduct

"demands a commonsense, functional judgment" that "should be informed and guided by 'familiar considerations of fair notice, reasonable reliance, and settled expectations.'" *Martin v. Hadix*, 527 U.S. 343, 357-58 (1999) (quoting *Landgraf*, 511 U.S. at 270).

In *St. Cyr*, the Court concluded that the retroactive application of IIRIRA section 304(b) would have an impermissible retroactive effect on aliens—such as St. Cyr—who had pleaded guilty prior to the repeal of § 212(c). The Court highlighted the *quid pro quo* of the criminal plea agreement, and reasoned that because aliens like St. Cyr almost certainly relied upon the likelihood of receiving discretionary relief in deciding whether to forgo their right to a trial, the elimination of any possibility of § 212(c) relief by IIRIRA has an obvious and severe retroactive effect. This appeal presents the question whether application of IIRIRA section 304(b) would have a similarly impermissible retroactive effect on the petitioner, Murali Krishna Ponnapula. Ponnapula turned down a misdemeanor plea agreement, went to trial when former § 212(c) was still in effect, and was convicted of a felony by the jury; he went to trial in reliance on the advice of his counsel that, even if he were found guilty, he would very likely not receive a sentence that would render him ineligible for § 212(c) relief, because of his very minor role in the offense.

Rejecting the position of the government that Ponnapula is precluded from claiming retroactive effect by reason

of the discussion in *St. Cyr*, we conclude that *St. Cyr* is simply one application of the general principles articulated in *Landgraf* that counsel against interpreting statutes to have retroactive effect. Here, with respect to an alien who reasonably could have relied on the potential availability of § 212(c) relief, application of the *Landgraf* principles shows that IIRIRA section 304(b) has an impermissible retroactive effect. Moreover, on this record, where the petitioner demonstrated clear and reasonable actual reliance on the former statutory scheme in making the decision to go to trial, there is *a fortiori* an impermissible retroactive effect. We begin with the facts of Ponnapula's case.

## I.

### A.

In 1993, a New York state grand jury indicted Ponnapula, along with several other defendants, for grand larceny in the first degree, N.Y. Penal Law § 155.42, and falsifying business records in the first degree, N.Y. Penal Law § 175.10. Essentially the offense involved a fraudulent application submitted to the Bank of India for a loan to generate working capital, secured by a valuable parking lot located near LaGuardia Airport in New York City. The loan application was submitted by a group headed by Ponnapula's brother, Dr. P.S. Prasad. Prasad and his assistant, Vijay Dandapani, prepared a loan application in the name of a shell company, listed Ponnapula as its

nominal president, and submitted an inflated personal net worth statement over his name. The loan was eventually approved. However, the undisputed evidence established that Prasad and Dandapani did all of this without Ponnapula's knowledge, and that Dandapani forged Ponnapula's signature on both the loan application and the net worth statement.

Over the next year, Ponnapula and the Manhattan District Attorney's Office engaged in plea negotiations. The District Attorney's Office offered to allow him to plead guilty to a misdemeanor with a probationary sentence. Ponnapula considered the offer and the immigration consequences of pleading guilty versus going to trial. His counsel advised him that if he was convicted, he would very likely receive the minimum sentence of only one to three years' imprisonment, which is less than the five years necessary to disqualify an alien from § 212(c) relief. Accordingly, Ponnapula reasonably believed that even if he were convicted of a felony after trial he would still likely be eligible for hardship relief from deportation pursuant to former § 212(c). In reliance on this advice, Ponnapula decided to turn down the misdemeanor offer and proceeded to trial. On December 20, 1994, he was convicted of both counts in the indictment. He was sentenced to the minimum term of imprisonment—one to three years.

The advice of Ponnapula's counsel, and his reliance thereon, is easily understandable, for the evidence at trial

4

barely established criminality. Indeed, Ponnapula's participation was so limited that the trial judge set aside the jury's guilty verdict and dismissed the indictment as to Ponnapula, for reasons chronicled in the margin.[2] It is also noteworthy that while the loan application contained false statements, the bank was well secured, and recovered $1.35 million of the $1.9 million loan amount when it ultimately sold the parking lot. However, the order setting aside the conviction was eventually reversed on appeal and the conviction reinstated.

Upon remand, the trial court imposed the mandatory minimum term of one to three years imprisonment on this New York State "B" felony, *see* N.Y. Penal Law § 155.42, but the trial judge recommended to the New York State Corrections Department that it "consider [defendant] for an early release program that encompasses work release." Ponnapula then filed a petition for habeas relief in the United States District Court for the Southern District of New York.

[2]According to Judge Carruthers:

The People presented no evidence that Murali participated in any way in the inclusion of any false statements contained in the loan application, or that Murali knew that the loan documents contained any false representations. The People's most important witness, Dandapani, testified that Murali was not informed of misrepresentations that Prasad ordered Dandapani and Shetty to include in the loan application and the supporting documents. Murali could not have learned from the documents themselves that Prasad was deceiving the bank. The evidence shows that Murali never had a chance to examine them. Thus, Murali was in no position to detect even the glaring misrepresentations concerning his finances that were contained in the loan applications.

With respect to the documents that Murali signed at the closing, Dandapani and Krasner, the bank's attorney, each testified that Murali only glanced at the papers, but did not read them before signing. Moreover, there was no evidence that Murali signed the documents with knowledge that Prasad intended to misapply the proceeds of the loan . . . .

. . . . [T]he People's key witness, Vijay Dandapani, testified unequivocally that Murali never knew of the misrepresentations made to the bank in the loan application. The remainder of the evidence presented by the People simply fails to support the contention that Murali was a knowing participant in any misrepresentations made by Prasad or his assistants with regard to the loan.

While concluding that the evidence had been legally sufficient to sustain petitioner's conviction of a larceny involving more than one million dollars, and that he was constrained to deny federal habeas relief, Judge Rakoff observed:

> [P]etitioner's counsel has convinced me that his client was, for lack of a better term, the small fry or—maybe even better term—the schnook of this particular group of miscreants.

> And though I have no power other than the power to comment on what should be done now in terms of his incarceration, for what it's worth, it seems to me it would certainly be in the interests of justice for him to be released on work release.

After Ponnapula was allowed out on work release, the INS filed a detainer and warrant for a removal hearing on October 2, 2000, and pursuant to New York law Ponnapula was returned to state custody. On January 8, 2001, after a hearing, an immigration judge found Ponnapula removable from the United States. On appeal, the BIA affirmed, holding that *St. Cyr* could not be extended beyond defendants who had pleaded guilty. On May 7, 2002, after two years of incarceration on his conviction, the New York State Department of Correctional Services released Ponnapula. Upon his release, the INS took him into custody and transferred him to the Pike County, Pennsylvania jail for detention. On May 8,

2002, pursuant to 28 U.S.C. § 2241, Ponnapula filed the habeas petition that is the subject of this appeal.

### B.

In analyzing the petition for hardship relief, the District Court reasoned that it was "presented with the very narrow legal question of whether . . . to apply IIRIRA retroactively to [Ponnapula]." *Ponnapula v. Ashcroft*, 235 F. Supp. 2d 397, 402 (M.D. Pa. 2002). However, it decided that the exemption-stripping provision in IIRIRA could not be applied, "[g]iven the factual underpinnings of this case," *id.*, and it concluded that Ponnapula was entitled to apply for hardship relief. More specifically, the District Court found that the "[e]limination of any possibility of former § 212(c) relief by IIRIRA has an obvious and severe retroactive effect on persons like Petitioner who relied on settled expectations of the immigration laws in place at the time he turned down a plea bargain and decided to go to trial." *Id.* at 403. It also found that "A major factor in his decision not to accept the offer was the lack of any distinction for the purposes of § 212(c) relief between a misdemeanor and felony conviction." *Id.* (internal quotation marks omitted).

Summarizing its position, the District Court ruled that "[i]n deciding not to accept the plea bargain offered, but instead to go to trial, Petitioner conformed his conduct to the settled expectation that § 212(c) relief would be available. Accordingly, the court finds that foreclosing § 212(c) relief to Petitioner would have an impermissible retroactive

6

effect." *Id.* at 406.

Because Ponnapula had lived continuously in the United States for seven years and had been sentenced to less than five years' imprisonment, he would have been eligible for § 212(c) relief had it not been eliminated. Indeed, it would appear from the record that he would likely have been granted it: Ponnapula's wife and two children as well as several of his brothers are naturalized United States citizens. All of them live in this country. Ponnapula's fourteen-year-old and twenty-year-old daughters do not speak Telgu, the native language of their parents. With the exception of the first one and one-half years of the older daughter's infancy, each has spent a total of only six weeks in India in their entire lives. The youngest daughter is in the ninth grade, and removal of her father would lead to her mother leaving the country, and would force the daughter to reside in a place where she has no ties and does not speak the language. Indeed, Ponnapula had been approved to become a United States citizen and was planning to take the oath in 1993, but did not do so because he was indicted for this offense before the oath could be administered.

## II.

### A.

It will be useful to set forth a brief description of the statutory regime in place prior to 1996 and the passage of AEDPA and IIRIRA. Under that regime, pursuant to § 212(c), a lawful permanent resident convicted of a deportable offense was statutorily eligible to seek from the Attorney General discretionary relief from deportation. *See* 8 U.S.C. § 1182(d)(1994). Prior to IIRIRA, immigrants who were deportable on the basis of a criminal offense could apply for § 212(c) relief so long as they had lived in this country continuously for seven years. Only those who had been convicted—either by plea or at trial—of a crime that fell under the definition of an "aggravated felony," *see* 8 U.S.C. § 1101(a)(43) (1994), and who had served a prison term of at least five years were statutorily ineligible for discretionary relief. *See* 8 U.S.C. § 1182(c) (1994). Even a defendant convicted of an aggravated felony and sentenced to five or more years' imprisonment might have maintained eligibility for § 212(c) relief provided that he had not served five years of his sentence by the time of his removal hearing.

There was also a strong likelihood that such relief would be granted: The Attorney General granted it in over half of all cases in which it was sought. *See St. Cyr*, 533 U.S. at 296 & n.5. Moreover, the relief was predictably granted where certain factors were present, including family ties within the United States, residence of long duration in this country, evidence of hardship to the immigrant's family as a result of deportation, and a stable history of employment. *See In re Marin*, 16 I&N

7

Dec. 581, 584-85 (BIA 1978).[3]

With IIRIRA, Congress repealed § 212(c) relief altogether and replaced it with a provision that created a new and significantly narrower form of relief called "cancellation of removal." This form of relief is now unavailable to any immigrant who was convicted of an aggravated felony, no matter the length of the sentence. *See* 8 U.S.C. § 1229b. The definition of "aggravated felony" has been retroactively expanded to include dozens more offenses, including misdemeanor and low-level felony offenses. *See* 8 U.S.C. § 1101(a)(43). Courts have upheld the application of the expanded definition of "aggravated felony" to minor offenses. *See, e.g.*, *United States v. Pacheco*, 225 F.3d 148, 154 (2d Cir. 2000) (misdemeanor state theft of a video game valued at $10, for which immigrant received one-year suspended sentence, is an aggravated felony); *United States v. Graham,* 169 F.3d 787, 792 (3d Cir. 1999) (misdemeanor crime of petty larceny is an aggravated felony).

The practical effect of the repeal of § 212(c) relief, in conjunction with several other statutory amendments, is that a far larger number of immigrants are now deportable under the new law, while a much smaller number are eligible for any form of relief from deportation.

Moreover, if the repeal is applied retroactively to immigrants such as Ponnapula, the practical effect is that it will convert what was the mere possibility of deportation into a certainty.

### B.

Since the principal authority governing this case is *Landgraf*, we rescribe its fundamental precepts. There the Supreme Court held that, absent a clear command to the contrary from Congress, there is a "presumption against statutory retroactivity." 511 U.S. at 270.[4] Without such a clear statement, retroactive application of a statute is impermissible when it "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.* at 280. In *Martin v. Hadix*, the Court elaborated that the

---

[3]Section 212(c) relief is governed by predictable standards, "comparable to common-law rules," *St. Cyr*, 533 U.S. at 296 n.5.

[4]*See also Landgraf*, 511 U.S. at 265, 271, 271 n.25, 272, 273, 275 n.29, 277, 278, 279, 286 (referring, variously, to the "presumption against retroactive legislation," the "presumption against statutory retroactivity," the "antiretroactivity presumption," and the "traditional presumption against truly 'retrospective' application"); *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 946, 947, 950, 951, 952 (1997) (same); *Hadix*, 527 U.S. at 352, 367 (same); *St. Cyr*, 533 U.S. at 316, 320, 324 (same); *Republic of Austria v. Altmann*, No. 03-13, slip op. at 14, 17 (U.S. June 7, 2004) (same).

question whether a new statute attaches new legal consequences to prior conduct "demands a commonsense, functional judgment" that "should be informed and guided by 'familiar considerations of fair notice, reasonable reliance, and settled expectations.'" 527 U.S. at 357-58 (quoting *Landgraf*, 511 U.S. at 280). Most recently, in *Republic of Austria v. Altmann*, the Supreme Court held that the *Landgraf* line does not apply to the "*sui generis* context" of the Foreign Sovereign Immunities Act, slip op. at 18, but nonetheless both the majority and dissent expressly reaffirmed *Landgraf*'s "old and well-established principle," slip op. at 3 (Kennedy, J., dissenting); *see also* slip op. at 13-18 (reaffirming but distinguishing *Landgraf*). The *Altmann* Court explained that "the aim of the presumption is to avoid unnecessary *post hoc* changes to legal rules on which parties relied in shaping their primary conduct." Slip op. at 17-18.

In *St. Cyr*, the Court applied the principles of *Landgraf* in considering whether IIRIRA's repeal of discretionary relief under former § 212(c) would have a retroactive effect if applied to an alien who was "convicted pursuant to a plea agreement at a time when [his] plea would not have rendered [him] ineligible for § 212(c) relief." *St. Cyr*, 533 U.S. at 320. The Court first examined whether the provisions repealing former § 212(c) evinced a clear Congressional intent to apply the repeal retroactively. Concluding that there was no such clear statement, *see St. Cyr*, 533 U.S. at 314-20, the Court next

considered whether applying the repeal retroactively would be impermissible. The Court concluded that applying the repeal to aliens "who entered into plea agreements with the expectation that they would be eligible for [§ 212(c)] relief" would "'attach[] a new disability, in respect to transactions or considerations already past'" and produce a retroactive effect. *Id.* at 321 (quoting *Landgraf*, 511 U.S. at 269). The Court ultimately held something somewhat more expansive: "We . . . hold that § 212(c) relief remains available for aliens, like respondent, whose convictions were obtained through plea agreements and who, notwithstanding those convictions, would have been eligible for § 212(c) relief at the time of their plea under the law then in effect." *Id.* at 326.

In reaching this conclusion, the Court focused on an alien's reasonable reliance on the possibility of discretionary relief under former § 212(c) as one of the most important factors prompting him to forego trial and enter a plea agreement. "Given the frequency with which § 212(c) relief was granted in the years leading up to . . . IIRIRA," the Court reasoned, "preserving the possibility of such relief would have been one of the principal benefits sought by defendants deciding whether to accept a plea offer or instead to proceed to trial." *Id.* at 323. Indeed, "[t]here can be little doubt that, as a general matter, alien defendants considering whether to enter into a plea agreement are acutely aware of the immigration consequences of their convictions." *Id.* at 322. In support of its conclusion that aliens who accepted plea

agreements prior to IIRIRA had a reliance interest in § 212(c) relief, the Court pointed to the *quid pro quo* at the heart of criminal plea agreements. *Id.* at 321. "In exchange for some perceived benefit, defendants waive several of their constitutional rights . . . and grant the government numerous tangible benefits." *Id.* at 322 (internal quotation marks omitted). The Court concluded that "[b]ecause [St. Cyr], and other aliens like him, almost certainly relied upon [the] likelihood [of receiving discretionary relief] in deciding whether to forgo their right to a trial, the elimination of any possibility of § 212(c) relief by IIRIRA has an obvious and severe retroactive effect." *Id.* at 325.

## C.

The crux of the government's argument is that the appeal is controlled by *St. Cyr*, which it views as resting uniquely on the existence of the *quid pro quo* of criminal plea agreements. The absence of this *quid pro quo* here, the INS argues, causes Ponnapula's claim to fail. Of course, the unspoken premise of this argument is that *St. Cyr* articulated the exclusive conditions for impermissible retroactivity in this context.

The Courts of Appeals for the Second and Fourth Circuits have confined *St. Cyr* to the plea-agreement context on the understanding that a *quid pro quo* is required. *See Swaby v. Ashcroft*, 357 F.3d 156, 161-62 (2d Cir. 2004)*; Rankine v. Reno*, 319 F.3d 93, 100 (2d Cir. 2003); *Chambers v. Reno*, 307 F.3d 284, 290-91

(4th Cir. 2002).[5] Other Courts of Appeals have also limited *St. Cyr*'s retroactivity holding to the plea-bargain context without specifically invoking the *quid pro quo* language from *St. Cyr. See Montenegro v. Ashcroft*, 355 F.3d 1035 (7th Cir. 2004) (per curiam); *Dias v. INS*, 311 F.3d 456 (1st Cir. 2002); *Armendariz-Montoya v. Sonchik*, 291 F.3d 1116 (9th Cir. 2002); *Brooks v. Ashcroft*, 283 F.3d 1268 (11th Cir. 2002). A related argument advanced by the INS and in these cases is that the immigrant has "rolled the dice" by going to trial and thereby forfeited any claim to certainty. *See, e.g.*, *Chambers* 307 F.3d at 291-92.

As we will explain, our interpretation of *Landgraf* and its progeny differs somewhat from these Courts'. But even accepting their understanding of *Landgraf*, we think Ponnapula's case distinguishable from the cases cited above, with the

---

[5]We have also suggested this in two opinions, *Chukwuezi v. Ashcroft*, 48 Fed. Appx. 846, 851 (3d Cir. 2002) and *Uspango v. Ashcroft*, 289 F.3d 226, 230 (3d Cir. 2002). Neither is binding on this issue on this panel, however, *see* Third Circuit IOP 9.1 ("Policy of Avoiding Intra-Circuit Conflict of Precedent"): *Chukwuezi* is a not-precedential opinion, and the discussion in *Uspango* of *St. Cyr* is dicta because it is not necessary to that opinion's holding—that a removal proceeding does not "commence," for purposes of 8 C.F.R. § 3.14 and IIRIRA's effective-date provision, with an alien's petition for asylum.

possible exception of *Swaby* (with which, at all events, we disagree). We first explain why we believe that other Courts of Appeals have perhaps misapplied *Landgraf* in this area, and we then show why, even under the constricted and questionable (but nonetheless prevailing) view, Ponnapula's somewhat unique situation still demands that he be considered for § 212(c) relief.

### III.

### A.

Because we disagree with other Courts of Appeals' application of *Landgraf* to the question in this case, some background on those Courts' treatment of *Landgraf* is necessary. We treat the Second Circuit's opinion in *Rankine* as representative. There, the Court laid out the Supreme Court's modern retroactivity doctrine with citations to *Landgraf*, *Hadix*, and *St. Cyr*, *see Rankine*, 319 F.3d at 98-99, much as we have done above, *see supra* Part II.B. The Court explained that the *Rankine* petitioners' "choice to go to trial puts [them] on different footing [from St. Cyr] in two crucial respects." *Rankine*, 319 F.3d at 99.

First, none of these petitioners detrimentally changed his position in reliance on continued eligibility for § 212(c) relief. Unlike aliens who entered pleas, the petitioners made no decision to abandon any rights and admit guilt—thereby immediately rendering themselves deportable—in reliance on the availability of the relief offered prior to IIRIRA. The petitioners decided instead to go to trial, a decision that, standing alone, had no impact on their immigration status. Unless and until they were convicted of their underlying crimes, the petitioners could not be deported.

\* \* \*

Second, the petitioners have pointed to no conduct on their part that reflects an intention to preserve their eligibility for relief under § 212(c) by going to trial. If they had pled guilty, petitioners would have participated in the *quid pro quo* relationship, in which a greater expectation of relief is provided in exchange for forgoing a trial, that gave rise to the reliance interest emphasized by the Supreme Court in *St. Cyr*. As the Court made clear, it was that reliance, and the consequent change of immigration status, that produced the impermissible retroactive effect of IIRIRA. Here, petitioners neither did anything nor surrendered any rights that would give rise to a comparable reliance interest.

*Id.* at 99-100 (citation omitted).

Three aspects of this opinion are noteworthy. First, neither in the passages above, nor anywhere else in the opinion,

11

does the word "presumption" appear,[6] yet the presumption against retroactivity is the essence of the *Landgraf* line of cases. Second, the passage above discussing a detrimental change in position appears to require actual reliance by the party seeking to avoid retroactive application, yet the Supreme Court has never required actual reliance in any case in the *Landgraf* line. Third, the Court's objection that "petitioners have pointed to no conduct on their part" suggests that the party seeking to avoid retroactive application bears an evidentiary burden, another requirement we are unable to locate in the *Landgraf* line. In the next section, we discuss in detail our concern that each of these may be unfaithful to *Landgraf* and its progeny.

### B.

The Second Circuit's lack of emphasis on the *presumption* against retroactivity is in considerable tension with the Supreme Court's consistent treatment of retroactivity analysis. *See supra* note 4 (cataloging references to "presumption" in *Landgraf*, *Hughes Aircraft*, *Hadix*, *St. Cyr*, and *Altmann*). The Supreme Court's framework for assessing the retroactivity of civil laws has been consistently applied: The Court first looks for a clear statement from Congress that a statute is to be applied retroactively, and will defer to such a command. *See, e.g.*, *Landgraf*, 511 U.S. at 270. But in the absence of a clear command, a consistent line of cases establishes that "'congressional enactments and administrative rules will not be construed to have retroactive effect.'" *Id.* at 272 (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988)).

*Landgraf* softens this apparently categorical stance by recognizing that another line of cases holds that "in many situations, a court should 'apply the law in effect at the time it renders its decision,' even though that law was enacted after the events that gave rise to the suit." 511 U.S. at 273 (quoting *Bradley v. Sch. Bd.*, 416 U.S. 696, 711 (1974)). The *Landgraf* Court cited as examples laws "authoriz[ing] . . . prospective relief," *id.*, "statutes conferring or ousting jurisdiction," *id.* at 274, and "[c]hanges in procedural rules," *id.* at 275. Harmonizing these two lines, the Court explained:

> When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, *i.e.*, whether it

---

[6]This is not strictly accurate: The phrase "presumption against retroactivity" does appear incidentally in an extended quotation of another Court of Appeals' decision. *See Rankine*, 319 F.3d at 102 (quoting *Lara-Ruiz v. INS*, 241 F.3d 934, 945 (7th Cir. 2001)).

would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

511 U.S. at 280.

Moreover, in *Hughes Aircraft*, the Court explained that a "conten[tion] that *only* statutes with one of these effects are subject to our presumption against retroactivity" would "simply misread[] our opinion in *Landgraf*." 520 U.S. at 947. The *Hughes Aircraft* Court held that the language quoted above "does not purport to define the outer limit of impermissible retroactivity," but merely describes "a *sufficient*, rather than a *necessary*, condition for invoking the presumption against retroactivity." *Id.* Because the Supreme Court has repeatedly couched its holdings in this area in terms of a liberal presumption—albeit one that arises only conditionally, on a finding of retroactive effect—we read *Landgraf* and its progeny to hold that the presumption against retroactivity is easily triggered, though not automatic.[7]

Our disagreement with the courts that have held that IIRIRA's repeal of § 212(c) relief is not impermissibly retroactive with respect to aliens who went to trial is that those courts have erected too high a barrier to triggering the presumption against retroactivity. This has the effect of treating *Landgraf* as establishing a presumption *in favor* of retroactive application, but such a presumption would be wrong—the Supreme Court explicitly held in *Hughes Aircraft* that the Court of Appeals had erred by concluding that *Landgraf* evinced a "strong presumption *in favor of* retroactivity." 520 U.S. at 950.

The Second Circuit's subtle heightening of the showing required to trigger the presumption against retroactivity is also visible in that Court's apparent insistence that an alien show actual reliance to reap the benefit of the presumption against retroactivity. It is a strange "presumption," in our view, that arises only on so heightened a showing as actual reliance (though as we explain, *see infra* Part IV, Ponnapula actually has made such a showing). Relatedly, the Second Circuit seems to require a quantum of evidence regarding the subjective intent of the party seeking to avoid retroactive application; this too strikes us as being in tension with the language of presumption in *Landgraf* and its progeny; furthermore,

---

[7]Parenthetically, we note that the holdings and reasoning of *Landgraf*, *Hughes Aircraft*, and *Hadix* are not somehow inapplicable to laws about deportation; the Court made plain in *St.*

*Cyr*, 533 U.S. at 325 n.55, that the retroactive application of an immigration law is analyzed no differently from the retroactive application of any other civil statute.

such a requirement incorrectly focuses attention on the particular facts and circumstances of the party before the court.

The Supreme Court has never required actual reliance or evidence thereof in the *Landgraf* line of cases, and has in fact assiduously eschewed an actual reliance requirement. *Landgraf*, *Hughes Aircraft*, *Hadix*, and *St. Cyr* all establish this. In *Landgraf*, the question was whether the Civil Rights Act of 1991's addition of compensatory and punitive damages remedies to certain Title VII suits could be applied retroactively to reach pre-enactment conduct. The Court concluded that the remedies could not be applied retroactively, but it reached this conclusion without once referring to the defendant's conduct or the defendant's actual expectations. In fact, the defendant (USI Film Products) *is not even mentioned* in the pertinent section of the Court's opinion. *See Landgraf*, 511 U.S. at 280-93. Indeed, it is difficult to see how USI Film Products *could* have proven its actual reliance on the absence of a punitive damages provision.

Likewise, in *Hughes Aircraft*, the particular situation or expectations of the defendant were immaterial to the Court's analysis. *Hughes Aircraft* was brought under an amendment to the False Claims Act that eliminated a defense to certain *qui tam* suits. Hughes Aircraft argued that the elimination of the defense could not be applied retroactively, and the Court agreed. Again, the Court evaluated the retroactivity question in the abstract, without reference to Hughes Aircraft's conduct or expectations, *see Hughes Aircraft*, 520 U.S. at 947-52, and it is again difficult to see how the defendant could have established its actual reliance on the prior state of the law.

*Hadix* concerned Congress's amendments to the fee provisions applicable to post-judgment monitoring in prison reform suits. The amendments capped the hourly fee recoverable on behalf of attorneys performing such monitoring. Attorneys for Hadix, one of the named plaintiff prisoners in the suit, claimed that the amendment was impermissibly retroactive because it reduced their hourly rate for work performed before the effective date of the amendment (because it had already been performed) and for work performed after the effective date of the amendment (because the attorneys could not ethically withdraw from the case until the prison reform decree was terminated). The Court agreed with the former position, *see Hadix*, 527 U.S. at 358-60, but rejected the latter because the attorneys "provide[d] no support for [their] assumption" about their ethical duties, *id.* at 361.

Important for our purposes is not the result, however, but the Court's reasoning. *Hadix* differs from *Landgraf* and *Hughes Aircraft* in that *Hadix* does in fact refer to the particular situation of the party seeking to avoid retroactive application. Nonetheless, the *Hadix* Court's discussion focuses not on the *bona fides* of the

attorneys' claimed actual reliance,[8] but instead on whether reliance was (or would have been) *reasonable*. *See, e.g.*, *id.* at 360 ("To impose . . . new standards now, for work performed before the [amendments] became effective, would upset the reasonable expectations of the parties."); *id.* ("After [the date of the amendment], any expectation of compensation at the [pre-amendment] rates was unreasonable.").

*St. Cyr* is the most recent case in the *Landgraf* line. As with *Hughes Aircraft* and *Landgraf* itself, the analytical focus of the opinion is not on the facts and circumstances of the party before the Court. The Court briefly considered the putative actual reliance of Enrico St. Cyr and a similarly situated alien, Charles Jideonwo, but did so merely for illustrative purposes. *See St. Cyr*, 533 U.S. at 323. *St. Cyr* is principally concerned with the reasonable reliance interests of aliens who enter into plea agreements as a class. To that end, the discussion of the *quid pro quo* in criminal plea agreements is directed at establishing, as a general matter, the

reasonable reliance of this class of aliens, irrespective of the course of St. Cyr's own plea negotiations.[9]

Moreover, the *St. Cyr* Court's language does not require concrete certainty about the exact historical motives and actual reliance and expectations of each alien who pled guilty. We set out several examples in the margin.[10] On the whole,

---

[8]For example, the *Hadix* Court did not cite affidavits or other representations from the attorneys that they actually relied on the higher hourly fee in electing to perform the monitoring services. For that matter, it is not inconceivable that attorneys engaged in such a practice might have performed their services with *or without* the marginally greater inducement of the higher pre-amendment fees.

---

[9]Indeed, the presence of a *quid pro quo* is excellent support, in an evidentiary sense, for the existence of a reliance interest, since a *quid pro quo* supplies two archetypal predicates for a reliance interest: foregoing a right (here, the right to a trial) and conferring a benefit (here, saving the government the costs and uncertainty of prosecution).

[10]*See, e.g.*, *St. Cyr.*, 533 U.S. at 323 ("[P]reserving the possibility of [§ 212(c)] relief *would have been* one of the principal benefits sought by defendants deciding whether to accept a plea offer . . . ." (emphasis added)); *id.* ("Relying upon settled practice, the advice of counsel, and *perhaps* even assurances in open court that the entry of the plea would not foreclose § 212(c) relief, a *great number of defendants* in Jideonwo's and St. Cyr's position agreed to plead guilty." (emphasis added)); *id.* (referring to plea agreements "that were *likely* facilitated by the alien's belief in their continued eligibility for § 212(c) relief" (emphasis added)); *id.* at 325 ("[R]espondent, and other aliens like him, *almost certainly* relied upon [the]

15

we think the Supreme Court regarded *St. Cyr* as a clear and straightforward result flowing from *Landgraf*; to paraphrase counsel for the *amici curiae* at oral argument, *St. Cyr* was an easy case on the retroactivity issue.

Thus the Supreme Court has avoided an "actual reliance" formulation in favor of a "reasonable reliance" formulation in its retroactivity analysis. "Reasonable reliance" is specifically highlighted in *Hadix*, 527 U.S. at 357-58 (holding that retroactivity analysis "should be informed and guided by 'familiar considerations of fair notice, reasonable reliance, and settled expectations.'"). The likelihood that the party before the court did or did not in fact rely on the prior state of the law is not germane to the question of retroactivity. Rather, courts are to concentrate on the group to whose conduct the statute is addressed—in *Landgraf* it was employers subject to Title VII; in *Hughes Aircraft* it was government contractors; in *Hadix* it was attorneys performing prison reform monitoring services; in *St. Cyr* it was aliens who accepted a plea agreement—with a view to determining whether reliance was reasonable.

The *Landgraf* line also establishes that a change in law can be found impermissibly retroactive without establishing that some (or all) members of the group affected by the change in law relied on the prior state of the law. For

likelihood [of § 212(c) relief]." (emphasis added)).

example, it is unlikely that in *Landgraf* any employer demonstrably relied on the absence of a punitive damages remedy for Title VII violations, or that in *Hughes Aircraft* any government contractor purposely arranged its billing practices *ex ante* to take advantage of a specific defense under the False Claims Act. Likewise, in *St. Cyr*, the Court found it sufficient that the plea agreements of deportable aliens were "*likely* facilitated by the aliens' belief in their continued eligibility for § 212(c) relief." 533 U.S. at 323 (emphasis added). And indeed the Court's holding is *not* limited to those aliens who *actually* relied on the availability of § 212(c) relief: "We . . . hold that § 212(c) relief remains available for aliens, like respondent, whose convictions were obtained through plea agreements and who, notwithstanding those convictions, would have been eligible for § 212(c) relief at the time of their plea under the law then in effect." *St. Cyr*, 533 U.S. at 326.

The holding in *St. Cyr* then is simply not subject to a qualification that the alien seeking the opportunity to pursue § 212(c) relief must have accepted a plea agreement that necessarily preserved his eligibility for § 212(c) relief (i.e., a plea agreement that provided for release from incarceration in less than five years' time). We find this significant because it further confirms that *Landgraf*'s limitations on the repeal of former § 212(c) are construed broadly in favor of those who had even a partial or contingent reliance interest in the existing state of the law—for example, an alien

16

who accepted a plea agreement with a six-year term of imprisonment that, through good behavior credits and the like, could be shortened to less than five years' time.[11]

## C.

We have established that the question we must answer is whether the repeal of § 212(c) relief is impermissibly retroactive with respect to aliens who elected to go to trial (or some relevant subset thereof). Stated another way, we ask what aliens—if any—who went to trial and were convicted did so in reasonable reliance on the availability of § 212(c) relief. If Ponnapula is among this group, we must affirm the District Court's grant of habeas corpus relief. We conclude that he is.

As noted above, in *St. Cyr*, the Supreme Court found that *all* aliens who accepted plea agreements had some reliance interest in the potential availability of § 212(c) relief. The Court concentrated its discussion on the alien's decision whether to accept the plea agreement. This focus is logical because the reliance interest of an alien who accepts a plea agreement arises at the time the choice is made to accept the agreement. Generally speaking, reliance interests (in the legal sense) arise because some choice is made evincing reliance. *Cf.* Restatement (Second) of Contracts § 90 (1981) (requiring "action or forbearance" to invoke promissory estoppel).

Accordingly, we focus on the choice made by aliens who went to trial and were convicted prior to the effective date of IIRIRA's repeal of former § 212(c).[12] We

---

[11]Indeed, St. Cyr himself accepted a plea that provided for a ten-year sentence, with execution suspended after five years. *See* Brief for the Petitioner at 11 n.7, *St. Cyr*, 533 U.S. 289 (No. 00-767), 2001 WL 210189. If he had actually served the full five-year unsuspended portion of his sentence, St. Cyr would have been ineligible for discretionary relief under § 212(c). *See* INA § 212(c) (depriving the Attorney General of the power to withhold deportation for "an alien who . . . has served . . . a term of imprisonment of at least 5 years" for certain crimes). Thus, even St. Cyr himself did not accept a plea that guaranteed his eligibility for § 212(c) relief.

[12]We acknowledge that our focus here on the decision of the alien to go to trial is somewhat in tension with our holding in *Perez v. Elwood*, 294 F.3d 552 (3d Cir. 2002), that an alien whose date of conviction for an aggravated felony falls after the effective date of IIRIRA is ineligible for § 212(c) relief on any theory; it is virtually certain that some aliens chose to go to trial before IIRIRA's effective date, but were actually convicted after the effective date. We cannot, of course, overrule *Perez*. *See* Third Circuit IOP 9.1 ("Policy of Avoiding Intra-Circuit Conflict of Precedent"). The tension with *Perez* need not detain us long, however, because the parties stipulated

17

may subdivide this category into (1) aliens who went to trial because they declined a plea agreement that was offered to them, and (2) aliens who went to trial because they were not offered a plea agreement. Because aliens in the latter category had no opportunity to alter their course in the criminal justice system in reliance on the availability of § 212(c) relief, we highly doubt (though do not explicitly hold, for the issue is not before us) that such aliens have a reliance interest that renders IIRIRA's repeal of former § 212(c) impermissibly retroactive as to them.

As for the former category, we hold that aliens such as Ponnapula who affirmatively turned down a plea agreement had a reliance interest in the potential availability of § 212(c) relief. For many aliens, the reliance interest is obvious and significant—Ponnapula himself has such a reliance interest because the then-existing parameters for former § 212(c) eligibility would so obviously factor into the decision-making of someone in his position. (Specifically, Ponnapula needed to ensure that, however the larceny charge was resolved, he would serve less than the five years specified in former § 212(c).) This conclusion is

---

below that Ponnapula's date of conviction for IIRIRA purposes (December 20, 1994) was prior to the effective date of IIRIRA (April 1, 1997). *See Ponnapula*, 235 F. Supp. 2d at 399 n.6. To accommodate *Perez* we simply limit our holding to aliens convicted before the effective date of IIRIRA.

buttressed by the Supreme Court's recognition that the availability of discretionary relief plays a central role in many aliens' decisions regarding whether to accept a plea agreement. *See St. Cyr*, 533 U.S. at 322-23. Though *St. Cyr* concentrated on the many aliens who ultimately accepted plea agreements, it is not reasonable to believe that all aliens who rejected plea agreements thereby disclaimed any interest in § 212(c) relief; in fact, quite the contrary is true. There are many reasons to proceed to trial—the lack of a plea agreement that would ensure eligibility for § 212(c) relief, the hope of an acquittal, or the simple desire to exercise fundamental constitutional rights—but few if any of them are inconsistent with preserving a contingent interest in § 212(c) relief.

A case about aliens who accept plea agreements (i.e., *St. Cyr*) is relatively straightforward because the availability of § 212(c) relief was very likely a dominant factor in their decision. This case may seem harder because making the decision to go to trial is perhaps more complex and more nuanced, but we should not let that obscure the fact that former § 212(c) was one of a host of factors considered by aliens who elected that course—and, per the Court's discussion in *St. Cyr*, a significant factor at that.

To be sure, there are aliens who would appear to have had a very attenuated reliance interest in the availability of § 212(c) relief—for example, aliens charged with the most serious of crimes, carrying the longest prison sentences, who turned

18

down unattractive plea agreements. Preserving eligibility for discretionary withholding of deportation was probably not foremost in such aliens' minds, for they had the slimmest of chances to qualify for § 212(c) relief. But the fact that an interest may have been attenuated, however, has had little salience in the Supreme Court's analysis of other retroactivity questions. For example, *ex ante* it was unlikely that Hughes Aircraft—or any given government contractor—would need to avail itself of a specific defense against a *qui tam* action; or that USI Film Products—or any given employer subject to Title VII—would find itself accused of discriminatory conduct meriting punitive damages. In neither case would anyone have claimed, *ex ante*, that the affected companies had anything more than a highly contingent—and thus seriously attenuated—interest in the then-existing state of the law.[13]

Moreover, in *St. Cyr* itself, as we have discussed above, the Court extended its holding to *all* aliens who had accepted plea agreements; some of these aliens necessarily had attenuated reliance interests in the availability of § 212(c) relief (for example, consider the hypothetical alien described above who accepted a plea bargain with a six-year term of imprisonment, subject to good-time credits). The *St. Cyr* Court's explanation that "the fact that § 212(c) relief is discretionary does not affect . . . our conclusion," 533 U.S. at 325, is also consistent with our understanding of how attenuated interests are to be treated in a retroactivity analysis: Attenuation of this kind generally does not render reliance unreasonable.[14]

---

[13]With respect to monitoring services already performed, *Hadix* presents a case at the opposite pole. There, the affected attorneys necessarily had an interest in the statute that set their maximum hourly rate. But this reveals only that *Hadix* was a relatively easy case—and indeed, the Supreme Court ruled unanimously in the attorneys' favor on the issue of monitoring services already performed. *See Hadix*, 527 U.S. 343 (opinion of the Court); *id.* at 362 (Scalia, J., concurring in part and concurring in the judgment); *id.* at 364 (Ginsburg, J., concurring in part and dissenting in part). *Hadix* thus does not speak to the question of

reasonable but attenuated reliance interests.

[14]"Attenuation" as we have discussed it in the text refers to the idea of one present consideration (among many) having only a minority influence on an actor's ultimate decision. There is another sense of "attenuation," however—one connoting causal remoteness. For example, the Court of Appeals for the Seventh Circuit has properly noted that "'it would border on the absurd' to argue that an alien would refrain from committing crimes or would contest criminal charges more vigorously if he knew that after he had been imprisoned and deported, a discretionary waiver of deportation would no longer be available to him." *Lara-Ruiz*, 241 F.3d

19

Finally, if it was reasonable in *St. Cyr* for an alien to rely on the attenuated availability of § 212(c) relief in *accepting* a plea agreement, we see no reason why it would be unreasonable for the same alien to likewise rely in *declining* a plea agreement. The reasonable reliance question turns on the nature of the statutory right and the availability of some choice affecting that right, not on the particular choice actually made. In sum, because aliens such as Ponnapula who affirmatively turned down plea agreements had a reliance interest in the potential availability of § 212(c) relief, we hold that IIRIRA's repeal of § 212(c) is impermissibly retroactive with respect to such aliens. While this statement seems broad, it is faithful to *St. Cyr*, which painted with broad strokes: "We . . . hold that § 212(c) relief remains available for aliens, like respondent, whose convictions were obtained through plea agreements and who, notwithstanding those convictions, would have been eligible for § 212(c) relief at the time of the plea under the law then in effect." 533 U.S. at 326. This reflected approval of Judge Oakes's opinion for the Second Circuit, *St. Cyr v. INS*, 229 F.3d 406 (2d Cir. 2000), which adopted the same categorical approach: "[W]e hold that the bar on applying for relief enacted in AEDPA § 440(d) and IIRIRA § 304 does not apply to an alien who pled guilty or *nolo contendere* to an otherwise qualifying crime prior to

IIRIRA's enactment date." *Id.* at 421.[15] Accordingly, Ponnapula is entitled to apply for discretionary withholding of deportation under former § 212(c).[16]

---

at 945 (quoting *LaGuerre v. Reno*, 164 F.3d 1035, 1041 (7th Cir. 1998)).

[15]Moreover, on a practical level, the difference between this holding and a more circumscribed one is smaller than it first appears. For some aliens sentenced to terms of five years or longer (following their rejection of plea agreements), there is a chance of serving less than five years, and preserving statutory eligibility for § 212(c) relief. *Cf. supra* note 11 (noting that St. Cyr would not necessarily have been statutorily eligible for § 212(c) relief). But the majority of aliens convicted of lengthy sentences will find that this opinion removes IIRIRA's bar to relief only to leave them foundering on the shoals of statutory ineligibility under former § 212(c) itself.

[16]We note in passing that, in comparison to the holding in *St. Cyr*, the effect of our overall holding is likely to be small. First, the class of aliens affected by this ruling is constantly shrinking in size as the effective date of IIRIRA recedes into the past. Second, as we note in the preceding footnote, many aliens who are within the scope of this holding will nonetheless be statutorily ineligible for § 212(c) relief by reason of having served five years or more in prison. Third, many times more criminal defendants enter into plea agreements than go to trial. *See St. Cyr* 533 U.S. at 322 n.47. Thus, for the vast majority of

20

* * *

In this Part, we have set out our view of the most faithful application of the *Landgraf* line to the case at bar. We recognize, however, that the other Courts of Appeals to address cases like Ponnapula's have taken a rather different approach to the retroactivity question. Though we stand on the foregoing analysis, we will also analyze Ponnapula's case under the rubric employed by those other Courts.

## IV.

### A.

We have described the background of facts, all uncontradicted and accepted by the District Court, which demonstrate that Ponnapula played a minor and essentially unknowing role in the fraudulent scheme. We incorporate these facts by reference here. The best description of Ponnapula's pretrial posture is supplied by the declaration of his trial counsel, Alexander E. Eisemann, Esq., in support of a motion for a temporary restraining order in the District Court. In pertinent part, Eisemann's declaration states as follows:

> At one point prior to

petitioner's trial, Assistant District Attorney David Steiner offered to allow him to plead guilty to a misdemeanor with a probationary sentence. Petitioner considered the offer and the immigration consequences of pleading guilty and going to trial. He realized that even if he were convicted of a felony after trial he would still be eligible for hardship relief from deportation pursuant to section 212(c) of the Immigration and Nationality Act, *see* 8 U.S.C. § 1182(c) (1994). Moreover, his counsel advised him that, if convicted after trial, he would likely receive a sentence of less than five years' imprisonment and that he would, in all likelihood, receive a sentence of only one to three years' imprisonment.

> In reliance on these facts, petitioner declined the misdemeanor offer and proceeded to trial.

App. 56-57.

In short, as the District Court noted:

> Here, there can be no doubt that Petitioner conformed his conduct to match his settled expectations of immigration law. Petitioner was offered an opportunity to plead guilty to a misdemeanor which would have had no immigration consequences, but turned down the plea because "even if he were convicted of a

removable criminal aliens, the retroactivity of IIRIRA's repeal of former § 212(c) was settled nearly three years ago by *St. Cyr*, so the decision we announce today affects a much smaller group of aliens.

21

felony after trial he would still be eligible for hardship relief from deportation pursuant to § 212(c)."

235 F. Supp. 2d at 405 (quoting Eisemann Decl.).

We stress that Ponnapula actually relied on the state of the law in rejecting the misdemeanor plea agreement and going to trial. Notably, none of the court of appeals cases treating *St. Cyr* as requiring a *quid pro quo* involved actual reliance by the immigrant on the then state of the law. Also, in these cases the charges (and the sentences) facing the immigrant were far more serious than those facing Ponnapula. For example, to recur to the cases cited *supra* Part II.C, Rankine was charged with attempted murder, his co-petitioner Lawrence, a repeat offender, was convicted of a mid-level drug offense, and his co-petitioner Eze was convicted of first degree rape.[17] *See Rankine*, 319 F.3d at 96-97. Theodoropoulos was convicted of a high-level drug conspiracy. *See Theodoropoulos v. INS*, 313 F.3d 732, 734 (2d Cir. 2002). Montenegro was convicted of possession of cocaine with intent to distribute, *see Montenegro*, 355 F.3d at 1036, as was Armendariz-Montoya, *Armendariz-Montoya*, 291 F.3d at 1118. In none of these cases does the record reflect or even suggest a plea agreement was offered, or that the defendant had reasonable assurance that

his sentence would be less than five years.[18] Thus Ponnapula's case seems distinguishable on its facts, both in that Ponnapula has demonstrated actual reliance where the aliens in other cases did not, and in that Ponnapula's offense was significantly less grave.

## B.

We must also engage the rationale of these cases. As will appear, while that rationale will support the result reached on the facts of those cases, any attempt to apply it to deny relief in Ponnapula's case falls of its own weight or at least cannot survive rigorous scrutiny. We treat *Rankine* as representative. In arriving at its result, the Court relied principally on selected parts of the Supreme Court's opinion in *St. Cyr*:

> The [Supreme] Court focused on the fact that plea agreements are a form of *quid pro quo* where, "[i]n exchange for some perceived benefit, defendants waive several of their constitutional rights (including the right to a trial) and grant the government numerous tangible benefits." [*St. Cyr*, 533 U.S.] at 322 (internal quotation omitted). Recognizing that §

---

[17]Lawrence and Eze were also resident aliens seeking the same relief as Rankine.

[18]Swaby was convicted of burglary and possession of marijuana. *See Swaby*, 357 F.3d at158. While this case may be closest to Ponnapula, the *Swaby* panel felt itself bound by *Rankine* and did not consider the matter *de novo*. *See id.* at 162.

212(c) relief was frequently granted prior to the enactment of AEDPA and IIRIRA, the Court found that "preserving the possibility of such relief would have been one of the principal benefits sought by defendants deciding whether to accept a plea offer or instead to proceed to trial." *Id*. at 323.

The Court also highlighted the "clear difference, for the purposes of retroactivity analysis, between facing possible deportation and facing certain deportation." *Id*. at 325. Because there was a "significant likelihood" that resident aliens would receive § 212(c) relief prior to IIRIRA, the Court found that aliens "almost certainly relied upon that likelihood in deciding whether to forgo their right to trial," *id*., and instead to plead to sentences that would preserve their eligibility for such relief. Without the possibility of relief, these pleas guaranteed the aliens' removal; the elimination of § 212(c), therefore, changed the legal effect of their pleas and unsettled their reliance. The Court concluded that "it would surely be contrary to 'familiar considerations of fair notice, reasonable reliance, and settled expectations' to hold that IIRIRA's subsequent restrictions deprive them of any possibility of such relief." *Id.* at 323-24 (quoting *Landgraf*, 511 U.S. at

270) (internal citation omitted). *Rankine*, 319 F.3d at 99. The Court conceded that *St. Cyr* did not directly control the outcome, but then opined that:

> We cannot, however, ignore the strong signals sent in those opinions that aliens who chose to go to trial are in a different position with respect to IIRIRA than aliens like St. Cyr who chose to plead guilty.

*Id.* We agree, for it is clear that *St. Cyr* does not control the outcome. But for reasons explained above, *see supra* Part III, we do not agree that relevant jurisprudence contains "strong signals" that aliens who go to trial are in a different position from those who plead guilty.

The wellspring of *Rankine* and its companion cases is a concern for actual reliance. Though we have explained why we do not believe that this is the best rendering of *Landgraf*, we accept that here as a starting point for the sake of argument. What becomes critical, then, is how to prove reliance. We agree that the kind of *quid pro quo* inherent in the acceptance of a plea agreement is one way to prove reliance; as we note above, the action and forbearance implicit in a *quid pro quo* is strong evidence of reliance. But it is surely not the only way to establish reliance, much less the talisman that the INS makes it out to be. An individual can rely or have settled expectations about a state of affairs

23

without having to enter into an exchange to secure or assure it.

From our discussion above of the lack of concern in the *Landgraf* line for actual reliance, it should go without saying that there is no mention of a *quid pro quo* or surrender of constitutional rights in *Landgraf*, *Hughes Aircraft*, or *Hadix*. Neither is there any mention of a *quid pro quo* in our decision in *Mathews v. Kidder, Peabody & Co.*, 161 F.3d 156, 164 (3d Cir. 1998):

> In this case, the events in question are the alleged fraudulent acts by the defendants. If the RICO Amendment is applied to this case, it would attach new legal consequences to these events. Before the Amendment, the legal consequences included liability under the federal securities laws and RICO; after the Amendment, the legal consequences included liability only under the securities laws.

Focusing then on new legal consequences to Ponnapula himself, they surely have occurred here. Ponnapula relied on the advice of counsel. It is hard to imagine that Ponnapula would not have accepted the misdemeanor plea offer if he had known about the risk of being ineligible for § 212(c) relief. And as the District Court concluded, "[a]defendant who goes to trial believing that his opportunity to seek § 212(c) relief is secure, is as equally disrupted in his reasonable and settled expectations as is a defendant who accepts a plea believing it to confer such a benefit." 235 F. Supp. 2d at 404.

We do not gainsay that the existence of a *quid pro quo* (for a guilty plea) justified the result in *St. Cyr*. But to the extent that the Court in *St. Cyr* noted that plea agreements involve a *quid pro quo* between the criminal defendant and the government and a waiver of several constitutional rights, *see* 533 U.S. at 322, these statements do not create an additional requirement necessary to establish retroactive effect. In our view, these statements only serve to highlight the obvious and severe retroactive effect of applying IIRIRA to aliens who pleaded guilty; in other words, the *quid pro quo* notion comfortably fit the case. What *Rankine* and its companion cases have done is to convert *quid pro quo* into a rigid baseline test, to ossify the language of *St. Cyr* into a test that the Supreme Court simply never mandated and we are unwilling to create.

In a variation on this theme, the government argues that "Ponnapula's simple expectation or reliance is not the same as the heightened expectation of relief which the *St. Cyr* aliens brought at the price of their constitutional rights and paid for with the immediate certainty of deportation." The *Rankine* Court used similar rhetoric: "The petitioners here assumed no similarly heightened expectation from their decision to go to trial." 319 F.3d at 100. We find no basis for a "heightened expectation" standard in *St. Cyr* or elsewhere in the Supreme Court's jurisprudence, and we reject it.

24

We have not here reviewed in detail each of the court of appeals cases that have rejected extending *St. Cyr* to immigrants who were convicted at trial before IIRIRA. Suffice it to say that the holdings in these cases are largely the result of the courts' failure to be convinced that immigrants who chose to go to trial could possibly have relied on the availability of 212(c) relief. As the Ninth Circuit stated in rejecting this argument: "Unlike aliens who pleaded guilty, aliens who elected a jury trial *cannot plausibly claim* that they would have acted any differently if they had known [that their decision would later make them ineligible for 212(c) relief]." *Armendariz-Montoya*, 291 F.3d at 1121(emphasis added); *see also Dias*, 311 F.3d at 458 ("It follows that, having been convicted after a trial *where there was not, and could not have been*, reliance by the defendant on the availability of discretionary relief, [petitioner] may not argue that the statute has impermissible retroactive effect as to him." (emphasis added)). This argument may be forceful given the serious charges facing the immigrants in those cases, *see supra* Part IV.A, but it withers in Ponnapula's case where, as we have explained, the immigrant conformed his conduct to the settled expectations of immigration law that there would be no adverse immigration consequences of going to trial.

## C.

Another notion that appears in the other court of appeals cases is that of "rolling the dice." In *Chambers*, the Court opined that the petitioner there did not possess "a reliance interest comparable to that which was at the heart of *St. Cyr*," 307 F.3d at 290, because "by rolling the dice and going to trial, Chambers actually ensured that his eligibility for discretionary relief would remain uncertain," *id.* at 291.

We find the "roll the dice" metaphor unhelpful, at least in this case. While Ponnapula may have "rolled the dice" in terms of guilt or innocence at trial, he did not do so with respect to immigration consequences in view of his reasonable expectation that there would be no adverse immigration consequences of going to trial. We do not generally speak of rolling the dice when the odds are stacked extremely heavily in one's favor. Assuming that the metaphor is applicable to someone, it does not apply to Ponnapula, because (to extend the metaphor), Ponnapula was (retroactively) deceived as to what was riding on the roll of the dice. Neither do we find persuasive the arguments that Ponnapula gave up "certainty" and should not be rewarded for "guessing wrong." These notions are inconsistent with our explanation of *Landgraf*.[19]

---

[19]We feel constrained to note that the notion that Ponnapula should be penalized so harshly, *ipso facto*, for going to trial, in the hopes of avoiding the disgrace and permanent stain of a conviction, seems to run counter to fundamental principles of the American

25

A related argument pressed by the government is that there can be no reasonable reliance in this case because there was a risk that Ponnapula might have been sentenced to more than five years in prison—and that, thereafter, he might have served more than five years in prison—thereby making him ineligible for § 212(c) relief. But Ponnapula was in fact sentenced to a maximum of three years in prison (and served even less), and the fact that counsel's advice proved to be correct buttresses the conclusion that it was reasonable for Ponnapula to rely on his counsel's advice in making his immigration decisions. The government would compare Ponnapula's risk of serving more than five years with the risk to the immigrant in *St. Cyr.* In fact, however, as we note above, *see supra* note 11, St. Cyr himself faced a greater term of imprisonment. Thus, the government is simply incorrect when it states that the immigrant in *St. Cyr* "pursued a litigation strategy that *ensured* his eligibility for section 212(c) relief."

### V.

In sum, approaching the issue in this case from the first principles of *Landgraf* retroactivity analysis, and rejecting the actual-reliance approach of our sister

---

constitutional polity, which encourages citizens to assert their innocence when convinced that they are not guilty of an offense, and go to trial.

Courts of Appeals, we conclude that Ponnapula is entitled to pursue § 212(c) relief. Accordingly, the judgment of the District Court granting Ponnapula's petition for a writ of habeas corpus will be affirmed.[20]

---

[20]We will, however, vacate the District Court's determination that Ponnapula is entitled to a bond hearing. The District Court should reevaluate its holding on that issue in light of the intervening Supreme Court decision in *Demore v. Kim*, 538 U.S. 510 (2003).

26